IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| DAKOTAH EARLEY, ) | |
| ) | |
| Plaintiff, ) | Case No. 23-cv-0801 |
| ) | |
| v. ) | The Hon. Judge Nancy Maldonado |
| ) | |
| CITY OF CHICAGO, ILLINOIS, *et al.* ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS

DAKOTAH EARLEY ("Dakotah" or "Plaintiff"), by and through his undersigned counsel, Amanda Martin, Esq., DISPARTI LAW GROUP, P.A., states as follows in opposition to the Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss ("Motion") filed by the CITY OF CHICAGO, ILLINOIS as a municipal corporation and as an indemnitor ("City"), LORI LIGHTFOOT ("Lightfoot"), in her official capacity as Mayor, DAVID O. BROWN ("Brown"), in his official capacity as former Police Superintendent, and the JOHN DOE 1 and JOHN DOE 2 (the "Doe Defendants") (collectively, hereinafter, "Defendants"). For the following reasons, the Motion should be denied in its entirety and, if any portion is granted, Plaintiff should be allowed an opportunity to amend.

## FACTUAL BACKGROUND

As alleged in the Complaint, Dakotah was walking home in Lincoln Park on the evening of May 6, 2022, when he was robbed and shot by a group of criminals that were later identified to include one Tyshon Brownlee ("Brownlee"). Dkt. 1, ¶¶15, 19. Dakotah's injuries were massive and forever life-altering, to include being shot twice in his back and once in the head, leading to months of hospitalization, partial leg amputation, abdominal surgery, and jaw surgery. Dkt. 1, ¶¶16-17.

Dakotah could not talk during his recovery, being relegated to communication through hand signals and writing. Dkt. 1, ¶18.

At the time of the shooting, Brownlee and his crew had been involved in what can only be described as a complete criminal rampage of robberies, gun hold-ups, and shootings across Chicago's North Side. Dkt. 1, ¶20. They conducted such activity out of a stolen BMW with a GPS locator that the police could have used to locate the vehicle at any time. Dkt. 1, ¶21. Paragraph 29 of the Complaint details some of the criminal acts, to include a robbery at gunpoint near 2900 North Clark, firing shots at another victim in Lincoln Park, a gunpoint robbery of a woman near 3000 North Racine where the victim identified the license plate of the stolen BMW, and another gunpoint robbery of a man near south Racine. Dkt. 1, ¶29. On belief, the criminal spree had more incidents that will be revealed in discovery.

Shockingly, "[j]ust before 2:00 a.m. on May 6, Chicago Police Dispatchers notified patrol officers that the GPS tracker had located the stolen BMW in the Northerly Island area; the police initially approached the vehicle, but then let it go." Dkt, 1, ¶29. "Police stated over the radio 'we're not following. We're not chasing. Show us heading to [the station] to do an eluding report." Dkt. 1, ¶29. "Just about an hour later," Dakotah was shot by Brownlee and his crew. Dkt. 1, ¶29.

Dakotah's massive injuries were caused by the chilling and hampering of police pursuits caused by the City's and Defendant Brown's enactment of a non-pursuit policy that has caused officers, on a widespread basis, to be in fear of pursuing criminals. Dkt. 1, *e.g.*, ¶¶32-33. But for this non-pursuit policy's effects on officer's, Dakotah never would have suffered the life-changing, massive injuries that include him being shot in the head and back and his leg being amputated.

Dakotah now brings this suit for injuries that would not have occurred but for the state created danger which directly evolved from the police officers' fear to apprehend criminals under the effects of the Defendant's non-pursuit policy.

2

## ARGUMENT AND DISCUSSION

I. **Plaintiff's Complaint States A Valid Claim Under The Due Process State-Created Danger Theory.**

    a. **Counts I and II Adequately and Properly State Underlying Constitutional Deprivations.**

Defendants first argue that Counts I and II should be dismissed because they do not adequately allege an underlying constitutional violation. *Motion*, pp. 3-7. They argue that "purely private misconduct" cannot violate constitutional rights. *Motion*, p. 3. Defendants support this argument by claiming that *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ("*DeShaney*") stands for the proposition that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by privates actors." *Id.* at 195. They claim *DeShaney* means that the Due Process Clause confers no affirmative right governmental aid, even where necessary to secure life, liberty, or property interests of the government itself. . ." *Motion*, p. 4 (citing *DeShaney* at 196). Defendants acknowledge, however, the two exceptions to this rule where (1) the plaintiff is harmed in government custody, and (2) the government engaged in conduct that created or increased the danger to a foreseeable Plaintiff. *Motion*, p.4. Defendants then cherry-pick language from three cases, *Jaimes v. Cook County*, 2022 WL 2806462 at *3 (7th Cir. 2002), *Weiland v. Loomis*, 938 F.3d 917 (7th Cir. 2019), and *Marsh v. Caruana*, 2022 WL 17038962 (N.D. Ill. 2022), to cast doubt on the state-created danger theory even being viable. Defendants next argue that, assuming the doctrine is viable, it is narrow and Plaintiff does not meet the standard because he does not adequately allege causation or an affirmative act by the City that caused his injuries. *Motion*, p. 5. These arguments ignore the case law, including that set forth in Plaintiff's Complaint, that show that Plaintiff has adequately stated a constitutional deprivation under the state-created danger theory, and that he has far more than adequately plead causation and foreseeability.

3

Substantial case law supports Plaintiff's Complaint. In *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993), the plaintiffs suffered injuries when a drunk driver crossed the center line of a highway and struck their vehicle. The following excerpt from *Reed*'s facts are key to this case:

> "Earlier that day, defendants Gardner, Davidson, and Bender had arrested the original driver of the car, leaving a drunk passenger behind. That passenger became the drunk driver who caused the head-on collision approximately two hours later."

*Reed*, p.1123. The District Court dismissed the Plaintiff's claims because, it claimed, *DeShaney* meant that the *Reed* plaintiffs could not state a constitutional deprivation, the same argument the City makes here. The Seventh Circuit then had to decide whether or not the injured *Reed* plaintiffs could state a claim under Section 1983 "when police officers arrest a sober driver and leave behind an obviously drunk passenger who takes the wheel." *Id.* at 1124. *Reed* recognized that *DeShaney* "leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger." Key here is *Reed*'s language that:

> "Police officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable. Certainly the Reeds are worse off with a drunk driver heading toward them than a sober one."

The *Reed* court distinguished itself from cases "in which state actors had no hand in creating a danger. . ." What made the *Reed* plaintiffs have a valid claim was that "[i]t was the police action in removing [the drunken driver], combined with their knowledge of [the passenger's] intoxication, which creates their liability for the subsequent accident." *Id.* at 1125. So too, the *Reed* court contended with the foreseeability argument made by the City in Section II of its Motion as follows:

> "The defendants' lack of direct contact with the appellants does not necessarily preclude this action against them. By removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one. The dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration. *See [Nishiyama v. Dickson County, 814 F.2d 277, 280 (6th Cir.1987) (en banc)](§)* (§ 1983 liability found where inmate uses patrol car to detain motorist whom he then murders, "identity of potential victims [not] difficult to define"). . ."

4

*Reed*, at 1127. Just like the dangers of a drunk driver being familiar and specific and the immediate threat of harm being of limited range and duration, Dakotah's Complaint alleges facts (excerpted below) that show that the threat presented by Brownlee and his crew in that stolen BMW was familiar and specific, and an immediate threat. Paragraph 29 lays this out – Brownlee and his crew had just been engaged in repeated robberies and shootings that could only be described as a complete rampage as set forth in Paragraph 29. Dkt. 1, ¶29. To let this vehicle go under the auspices of the pursuit policy and its chilling effects not only shocks the conscience and offends the principles of justice enshrined in the Due Process Clause. It was completely foreseeable that Brownlee and his crew would continue in their pattern of armed robberies and shootings to the same extent it was foreseeable that a drunken driver would continue to drive and hit another vehicle and cause injury. Defendants' arguments might be more well-founded if Brownlee and his crew had just committed one armed robbery, or just one shooting, or if the police did not know which vehicle (the stolen BMW) was being used in these acts. That is not this case. The criminals that the police could have pursued and tracked were indeed on a violent criminal spree for hours. The normalized failure to pursue violent criminal offenders shocks the conscience and is an offense to justice which falls within the scope of the Due Process Clause in this case. The police had a specific location of the vehicle, had it in their sights, they approached the vehicle, but then they simply stopped enforcing the law, in favor of making an eluding report. This was indubitably because of the chilling effect and practical outcome of the Defendants' non-pursuit policy on the actions of the officers. Dkt. 1, ¶29. Equally shocking to the conscience, is that the police could have obtained the exact GPS coordinates of the vehicle from the dealership and did not, which is an important fact, but not the main one supporting the state-created danger theory of this case. So too, causation is as easy as foreseeability in this case: Dakotah never would have been shot if the police had stopped and apprehended that vehicle.

Dakotah's Complaint states facts aligned with those in *Reed*. In Paragraph 21, Dakotah alleges that "on May 6, 2022, Chicago police dispatchers notified patrol officers that a GPS tracker had located a stolen BMW in the vicinity of Northerly Island, east of Soldier Field." Dkt. 1, ¶21. He then alleges that "approximately an hour after the police were notified of the stolen vehicle, the vehicle appeared at the intersection of Webster and Wayne in Lincoln Park, a gunman. . ., got out" and shot Dakotah. Dkt. 1, ¶24. Plaintiff also alleged that the police declined to follow the report of the stolen vehicle they had received just an hour because the shooting. Dkt. 1, ¶23. The powerhouse facts bringing Dakotah's claims over the line into the state-created danger theory come next at Paragraph 29, where he lists seven different pieces of information the police possessed about the same stolen vehicle that dispatch had notified them of an hour before the shooting. Paragraph 29 is worth reprinting to show this:

"At the time of Earley's shooting, however, the Chicago Police Department was in possession of an enormous amount of factual information that it could have used to apprehend Brownlee and his crew, including, but not limited to:

   a. The BMW was taken from a man who was robbed at gunpoint on the 2900 block of North Clark the night before.
   b. That within minutes of the Clark Street robbery, a group of armed men fired shots at another robbery victim in nearby Lincoln Park. That victim was not injured.
   c. Four hours before police spotted the car on the Museum Campus, a woman was robbed at gunpoint on the 3000 block of North Racine. She memorized the license plate number of the gunman's getaway car and gave it to police. The license plate number she gave perfectly matched the BMW's plate.
   d. That woman told officers the gunman also robbed another woman across the street from her, but she didn't know where the victim went.
   e. Minutes after the women were robbed, a man was robbed at gunpoint four blocks south on Racine.
   f. All of the robberies involved armed men wearing ski masks who left a vehicle and confronted people who were walking down streets.
   g. Just before 2:00 a.m. on 'May 6, Chicago Police Dispatchers notified patrol officers that the GPS tracker had located the stolen BMW in the Northerly Island area; the police initially approached the vehicle, but then let it go. Police stated over the radio, '[w]e're not following. We're not chasing. Show us heading into [the station] to do an eluding report.' Just about an hour later, Earley was shot by the occupants of the vehicle.'"

6

Dkt. 1, ¶29. All of the foregoing allegations are analogous to what happened in *Reed*, where the police had full knowledge of an intoxicated passenger and left him in the vehicle, leaving him to then drive the vehicle and injure the *Reed* plaintiffs. In Dakotah's case, the police had notification after notification and – most crucially of all here – had notice of the vehicle's location just an hour before Dakotah was shot, approached the vehicle, and then ceased following it. Dkt. 29, ¶29(g). This is no different than the officers in *Reed* knowing about the intoxicated passenger and leaving him in the vehicle, whereafter he then drove it into the *Reed* plaintiffs.

The City attempts to distinguish *Reed* by citing to dicta within it, while ignoring the crucial sentence that defeated the motion to dismiss: "[i]t was the police action in removing [the drunken driver], combined with their knowledge of [the drunken passenger's] intoxication, which creates their liability for the subsequent action." In Dakotah's case, it was the police action in following an unreasonable pursuit policy and practice which, in fact, has caused officers to stand down when they should act, combined with their extensive knowledge of the high danger presented by Brownlee's vehicle, that defeats this Motion. The same goes for the foreseeability argument Defendants' make: the police had reason to know the drunken passenger would strike another vehicle, just like the police in this case had reason to know that Brownlee and his crew would commit yet another violent crime with a gun if not stopped, which ended up being shooting Dakotah. If the foreseeability was sufficiently strong in *Reed*, it is sufficiently strong here to withstand this Motion.

The foreseeability of a drunk driver crashing into another vehicle and causing injury arguably is less foreseeable than what happened in this case. Here, Brownlee and his crew committed a string of ongoing violent, armed crimes and the police had the opportunity to stop that, but chose not to under fear of potentially violating the non-pursuit policy. As they said "We will not follow. We will not chase." They did not even follow, and that emboldened the criminals to continue their rampage

7

resulting in Dakotah's shooting. Defendants' argument about foreseeability interprets it far too narrowly under our district's cases.

*Reed* is not the only case supporting Plaintiff. In *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), a citizen fell into a lake, police responded, only to have another deputy order the responding authorities to stand down as follows:

> "Before any rescue attempt could begin, however, Lake County Deputy Sheriff Gordon Johnson arrived in a marine patrol boat. The city of Waukegan and Lake County had previously entered into an intergovernmental agreement that required the county to provide all police services in the entities' concurrent jurisdiction on Lake Michigan. Under its authority to police the lake, the county and its sheriff had promulgated a policy that directed all members of the sheriff's department to prevent any civilian from attempting to rescue a person in danger of drowning in the lake. This policy contemplated that only divers from the city of Waukegan Fire Department could carry out such a rescue.
>
> With this policy in mind, Deputy Johnson ordered all of the persons then on the scene to cease their rescue efforts. When the civilian scuba divers stated that they would attempt the rescue at their own risk, Johnson responded that he would arrest them upon their entry into the water and even positioned his boat so as to prevent their dive. A Waukegan police officer agreed that Johnson had authority over the scene and advised his fellow city employees that they should heed Johnson's instructions."

*Ross*, at 1425-1426. The *Ross* plaintiff died as a result. *Id.* at 1426. The Seventh Circuit in *Ross* held that the plaintiff stated causes of action for unconstitutional deprivations against the County and the individual deputy who ordered off the rescue. *Id.* at 1430-1433. The Section 1983 count against the County survived dismissal because, *inter alia*, "as portrayed in Plaintiff's complaint, Lake County's police not only tolerated a risk that someone might drown but actually contemplated that some persons would die for the sake of preventing harm to private rescuers." *Id.* at 1431. The Seventh Circuit found the deputy liable because he acted under color of law and his liability tracked the reasoning of the County's liability. *Id.* at 1432. Once again, as alleged in Dakotah's case, the police officers stood down from even following a vehicle they had every reason to know was a

8

massive danger even up to an hour before the shooting. Dkt. 1, ¶29. The City attempts to argue that Dakotah is merely stating a failure to act, and there is no affirmative act alleged in the Complaint that increased his danger so as to support the state-created danger theory. *Motion*, p.6. Not so. The Complaint does not merely allege that the pursuit policy is the problem, it alleges that the effects and practices stemming from the pursuit policy are the problem, as follows:

> "31. At all times, Defendants Lightfoot and Brown acted with extreme recklessness in enacting and maintaining the non-pursuit policy, knowing full well that there was a high probability that the policy would chill and hamper rank-and-file officers from engaging in pursuits to stop criminals such as Brownlee and his crew.
>
> 32. At all times, Defendants Lightfoot and Brown acted with deliberate indifferent in enacting and maintaining the non-pursuit policy, knowing full well that there was a high probability that the policy would chill and hamper rank-and-file officers from engaging in pursuits to stop criminals such as Brownlee and his crew.
>
> \*\*\*
>
> 41. At all times, Chicago's Police Department affirmatively acted and maintained an official non-pursuit policy that chilled and hampered officers in their ability and willingness to stop criminals such as Brownlee.
>
> 42. The non-pursuit policy has specifically caused a widespread chilling of police activity by officers for fear of civil and criminal liability among officers for engaging in pursuit activities.
>
> 43. By the City of Chicago's maintenance of this specific non-pursuit policy, it has created and increased the danger that persons such as Plaintiff will be the victims of criminal activity as occurred in his case."

Dkt 1, ¶31, 32, 41-43. Contrary to the City's argument that Dakotah has alleged mere failure to act, he has repeatedly alleged that this specific non-pursuit policy has caused a chilling effect on police action that increased the danger this would happen to Dakotah in the above paragraphs. The City's argument oversimplifies what Plaintiff alleges in this case. That the policy has caused such an effect is not only logical and apparent, it is obvious with the alarming allegations at Paragraph 29, where the police are alleged to have reported on the dispatch recording that "[w]e're not following.

9

We're not chasing. Show us heading into [the station] to do an eluding report." Dkt, 1, ¶29. So the City's argument that the Complaint alleges a mere failure to act and a mere constitutional policy misreads what the Complaint alleges about the policy and its effects and practical results on law enforcement.

Another case that supports Dakotah's theory of recovery is *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). In that case, the District Court dismissed a complaint that alleged that minors were riding in a vehicle when the driver was stopped and arrested. *White*, at 382. The arresting officers refused to take the children to the police station or a phone booth, causing them to cross eight lanes of traffic to find a phone to call their mother, who also asked for police assistance and was refused. *Id.* The children suffered mental injury and one was hospitalized. *Id.* The Seventh Circuit held that such conduct "indisputably breaches the Due Process Clause." *Id.* at 383. Separate from the arguments in this section, the Court notes, which is applicable to this case, that "it can hardly be doubted that chief among [protected liberties] is the right to some degree of bodily integrity." *Id.* at 383 (citing *Ingraham v. Wright*, 430 U.S. 651, 673 (1976)). The Court noted that the Due Process Clause also restrains state activities which are "fundamentally offensive to 'a sense of justice' or which 'shock the conscience'." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)). The Court found that the *White* complaint stated a cause of action because, *inter alia*:

"It is clearly established that although officials may not be held liable for simple negligence, they may be held liable for 'gross negligence' or 'reckless disregard' for the safety of others. In the case before us the police could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic. This indifference in the face of known dangers certainly must constitute gross negligence."

*Id.* at 385 (footnotes omitted). The same indifference in the face of known dangers exists in the case at bar, but that indifference stemmed not from a mere failure to act, but a failure to act due to a policy that restrained them from acting, thus creating a foreseeable shooting that happened to plaintiff.

10

For the foregoing reasons and on the basis of the foregoing cases, this Court should deny the Defendants' Motion to Dismiss and allow this case to proceed into discovery.

### b. Count I Adequately and Properly alleges an Unconstitutional Policy.

Defendants next argue that Plaintiff fails to adequately allege an unconstitutional policy by not identifying specific language in the non-pursuit policy that explicitly violates a person's constitutional rights or that it omits something that does so. *Motion*, p.7. They claim that a single instance is insufficient to state such a claim. *Id.* They cite to the policy itself and attach it, arguing that the policy properly creates a balancing test, and that Plaintiff alleges no facts that the policy on its face violated his constitutional rights. *Id.* at 8.

To prevail on a § 1983 claim against a municipality under *Monell,* a plaintiff must challenge conduct that is properly attributable to the municipality itself. *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 403-04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Specifically, the plaintiff must prove that the constitutional violation was caused by a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. We have interpreted this language to include three types of actions that can support municipal liability under § 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic,* 916 F.3d 611, 617 (7th Cir. 2019) (quotation marks omitted).

Defendants misread the Complaint, which alleges a Step 2 version of *Monell* liability, *to wit*, that the policy has created a custom and practice of "chill[ing] and hamper[ing] rank-and-file officers from engaging in pursuits to stop criminals such as Brownlee and his crew." Dkt. 1, ¶31. The Complaint then states that "[t]he non-pursuit policy has specifically caused a widespread chilling of

11

police activity by officers for fear of civil and criminal liability among officers for engaging in pursuit activities," which has created and increased the danger that persons such as Plaintiff will be the victims of criminal activity as occurred in his case." Dkt. 1, ¶43. Paragraph 46 again expresses that the policy has created a custom and practice of non-pursuit, stating that it has caused "a high probability that the policy would chill and hamper rank-and-file officers from engaging in pursuits to stop criminals such as Brownlee and his crew. Dkt. 1, 46-47. Paragraph 51 states it has created a danger to the public and Plaintiff. Dkt. 1, ¶51. In other words, Defendants interpret this as an "express policy" case, when it is a custom-and-practice-based *Monell* claim.[1] For that reason, the Defendants' Motion should be denied on this front.

For *Monell* to work, of course, there must be an underlying constitutional deprivation. *See, e.g.*, *First Midwest Bank Guardian v. City of Chicago*, 988 F.3d 978, 990 (7th Cir. 2021) ("*Monell* and *DeShaney* are not competing frameworks for liability. The two cases concern fundamentally distinct subjects. *Monell* interpreted § 1983 and addressed the issue of who can be sued under the statute; the Court held that a municipality is a "person" under § 1983 and may be liable—just like an individual public official—for its own violations of federal rights. 436 U.S. at 694, 98 S.Ct. 2018. *Monell* did *not* address the substance of any right under the federal Constitution or laws. It has nothing to say on that subject. It's a statutory-interpretation decision."). In Dakotah's case, he is alleging that the state-created danger theory of Due Process exists by the hampering and chilling of police activity caused by the non-pursuit policy at least as alleged in Paragraphs 43, 46-47, and 51. In other words, to make this clear, it is the state-created danger of the hampering and chilling of policy activity caused by the non-pursuit policy that is the constitutional deprivation for

---

[1] Plaintiff's counsel will represent to the Court that following the filing of this Complaint, the firm received numerous calls from other members of the public reporting similar situations happening to them. While Plaintiff submits this Complaint is properly and adequately pleaded for notice-pleading purposes, Plaintiff could amend and add these other instances to support a custom-and-practice-based *Monell* claim. This is really an issue for discovery more so than the pleadings.

12

Section 1983 purposes. It is the widespread custom and practice of this that makes the City of Chicago a "person" for Section 1983 purposes on such a constitutional deprivation claim.

For the foregoing reasons, Defendants' Motion should be denied on such basis.

### c. Count III Stands Because Counts I and II Stand.

Plaintiff agrees that the indemnification claim in Count III rises and falls with Counts I and II, which, because the latter stand, so should Count III.

### II. Plaintiff Plausibly Alleges Causation.

Defendants next argue that Plaintiff fails to adequately allege causation because, they claim, he has not alleged that any policies or act of the City were the moving force behind his injuries. *Motion*, pp. 9-10. They cite the common law standard for proximate causation as requiring "(1) that there be a direct relationship between the plaintiff's injuries and the wrongful conduct alleged; and (2) that those injuries be a reasonably foreseeable consequence of that wrongful conduct." *Motion*, p. 9. They state that, for *Monell* purposes, "municipal policies must also be the proximate cause of those injuries." *Id.* They state that *Monell* requires a "direct causal connection" between an alleged policy and a plaintiff's injuries." *Id.* They claim Plaintiff's Complaint as to causation is wholly conclusory by cherry-picking the statement in the Complaint stating, "'as a direct and proximate [2]cause of the Police Department's non-pursuit policy,' he suffered his injuries." *Id.* These arguments are based a misreading and exaggerated minimization of what is actually plead in the Complaint.

Much of Plaintiff's response to this is already contained in the foregoing sections of this Response, but to make it crystal clear, the facts about the Brownlee rampage in Paragraph 29, combined with the fact alleged in Paragraph 29(g) that the police had specific knowledge of the

---

[2] Plaintiff clarifies that he intends to leave open the possibility that Lightfoot is liable on an individual capacity basis in the event discovery supports such a claim.

13

whereabouts of Brownlee's vehicle about an hour before the shooting should themselves suffice to establish causation between the effects of the non-pursuit policy and Plaintiff's injuries. If the police had pursued Brownlee after that notice from dispatch of his whereabouts, there can be no question they would either have apprehended Brownlee, or pursued him to the point that it affected his location and he would have not encountered Dakotah. To make that more clear, if the police had pursued Brownlee in the Northerly Island area as he was alleged to have been in Paragraph 29(g), Brownlee would certainly been chased away from the Lincoln Park area where he ended up shooting Dakotah, if not apprehended. Either way, that "chill[ing] and hamper[ing]" of police activity on a widespread basis resulting from the non-pursuit policy, is what proximately caused Dakotah's massive injuries. Dkt. 1, ¶¶15, 16, 17, 18 (describing his injuries, to include months-long recovery and speech relegated to hand signals and writing during it); Dkt. 1, ¶¶46-47, 51 (describing the chilling of police activity caused by the non-pursuit policy). Causation, both proximately and in fact, have been more than adequately plead, and Defendants' argument to the contrary should be rejected.

### III. Plaintiff Adequately States an Individual Capacity Claim Against Defendant Brown; Plaintiff Agrees To Dismiss Defendant Lightfoot As Duplicative Of The Claim Against The City.

At pages 11 and 12, Defendants make the argument that not enough facts are plead to support individual involvement by Brown. *Motion*, pp. 11-12. Defendants cite to *Henderson v. Sheahan*, 1995 WL 519704 (N.D. Ill. 1995) for support, but in that case all that was alleged was that the Sheriff was responsible as a supervisor of others, and did not allege any other personal involvement. *Motion*, p.11. Much more is alleged in this Complaint than represented by Defendants.

Plaintiff adequately pleads an individual capacity claim against Brown in Paragraphs 46 and 47, stating that Brown knew "full well that there was a high probability that the policy would chill and hamper rank-and-file officers from engaging in pursuits to stop criminals such as Brownlee and

14

his crew." Dkt. 1, ¶¶46-47, 62-63. This is sufficiently alleged personal involvement by Brown to support an individual capacity claim. Perhaps most notable, in the pursuit policy attached to their Motion, David Brown is the signatory. Dkt. 14-1. The issue of his specific knowledge of how that policy would impact officers apprehending criminals is a discovery issue, but between that exhibit and Paragraphs 46-47 and 62-63, there is more than enough factual support in the Complaint and Defendants' Motion to support individual liability against Defendant Brown.

However, Plaintiff does agree to dismiss Defendant Lightfoot in her official capacity as duplicative of the claims against the City of Chicago. Defendants' Motion should be denied as to Brown, though, for the reasons just noted.

### IV. Plaintiff Agrees To Strike The Requests For Injunctive Relief.

Plaintiff agrees with the case analysis in Defendants' Section IV on pages 12 to 15 of their Motion regarding standing as to injunctive relief, and agrees to strike the requests for injunctive relief in the Complaint, however, plaintiff would request that such be done without prejudice in the event that discovery reveals facts to confirm standing for an injunction.

### V. Discovery Should Proceed During The Pendency of This Motion As This Court Has Already Ruled.

This Court has already ruled that discovery should proceed during the pendency of this Motion, and Defendants' argument about staying discovery is, therefore, presumably moot as already denied

Wherefore, for the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion in its entirety, or otherwise grants Plaintiff leave to replead as may be deemed necessary.

Respectfully submitted,

/s/ *Amanda M. Martin*

_____

Amanda M. Martin, Esq.

15

                                                                                                   One of Plaintiff's Attorneys

Amanda M. Martin, Esq.
DISPARTI LAW GROUP, P.A.
121 West Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: 312-506-5511, ext.355
E: amartin@dispartilaw.com

16

## CERTIFICATE OF SERVICE

PLEASE TAKE NOTICE that the undersigned, Amanda M. Martin, an attorney, hereby certifies that she caused to be served the foregoing Plaintiff's Response in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss to all counsel of record via this Court's CM/ECF service provider on May 18, 2023, and that all such counsels are registered e-filers.

/s/ *Amanda M. Martin*
_____