**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Dakotah Earley, <br><br> Plaintiff, <br><br> v. <br><br> City of Chicago, Lori Lightfoot, David Brown, John Doe 1, and John Doe 2, <br><br> Defendants. | Case No. 23 C 801 <br><br> Hon. LaShonda A. Hunt |

## MEMORANDUM OPINION AND ORDER

Currently pending before the Court is the motion of Defendants City of Chicago, Lori Lightfoot, and David Brown, under Fed. R. Civ. P. 12(b)(6), to dismiss the civil rights complaint filed by Plaintiff Dakotah Earley. For the following reasons, Defendants' motion to dismiss [14] is granted and Plaintiff's complaint [1] is dismissed without prejudice.

## BACKGROUND[1]

Earley lived in the Lincoln Park neighborhood of Chicago at the time of the unfortunate events giving rise to this case. When the complaint was filed, Lightfoot was the Mayor of Chicago and Brown was the Superintendent of the Chicago Police Department (CPD). Defendants John Doe 1 and John Doe 2 are unidentified CPD officers.

On May 6, 2022, around 3:00 a.m., Earley was walking near his home when he was robbed and shot three times, twice in the back and once in the head. Miraculously, Earley survived. During

---

[1] Unless otherwise noted, this section sets forth the non-conclusory factual allegations of the complaint, which must be taken as true for purposes of analyzing this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Information from Chicago Police Department General Order G03-03-01, entitled "Emergency Vehicle Operations - Eluding and Pursuing" is also discussed. (Defs.' Mot., Ex. 1, Dkt. No. 14-1). Although Rule 12(d) generally requires the Court to convert a Rule 12(b)(6) motion into a Rule 56 summary judgment motion if matters outside the pleadings are presented and not excluded, the policy is considered part of the complaint, as it is referred to repeatedly in the pleading and central to Earley's claims. *Venture Assocs. v. Zenith Data Sys.*, 987 F.2d 429, 431 (7th Cir. 1993).

1

his months-long hospitalization and recovery, Earley required jaw, abdominal, and partial leg amputation surgeries and was unable to talk. Earley's lasting injuries include the partial loss of his leg, partial permanent brain injuries, speech impediments, mobility problems, post-traumatic stress, and overwhelming emotional distress.

Starting two days before Earley's attack, on May 4, 2022, Tyshon Brownlee and a group of other men were involved in a string of armed robberies on Chicago's North Side. The crime spree included the following incidents: the night before Earley was robbed and shot, a man was robbed at gunpoint and his BMW vehicle was stolen in the 2900 block of North Clark;[2] minutes later, another victim was robbed in Lincoln Park—shots were fired but fortunately the victim was not injured; on May 5, 2022, around 9:00 p.m., a woman was robbed at gunpoint in the 3000 block of North Racine—she reported that another woman across the street was also robbed and provided police with a license plate number for the getaway car that matched the stolen BMW; within minutes, another man was robbed at gunpoint a few blocks away. All the robberies involved armed men wearing ski masks who left a vehicle and confronted victims walking down the street.

The vehicle stolen by Brownlee and his crew was equipped with a GPS system that allowed police to monitor and track the real-time location of the vehicle.[3] Although the complaint alleges that "the police were at all times aware that they could have apprehended the vehicle on the basis of the GPS tracking system[,]" (Compl. ¶ 36), and that "Defendants at all times were aware of the

---

[2] The complaint alleges that the BMW was taken in Lakeview "the previous night" (Compl. ¶ 22) and on the 2900 block of North Clark "the night before." (Compl. ¶ 29a). Because Earley was attacked on the morning of May 6, 2022, it is not clear if Earley means the vehicle was stolen on May 4, 2022, or May 5, 2022.

[3] Earley also alleges that the vehicle's GPS system was being monitored, "on belief, by the dealership" (Compl. ¶ 36) and argues in his response brief that "police could have obtained the exact GPS coordinates of the vehicle from the dealership and did not." (Pl.'s Resp. at 5). These are the only instances where he mentions "the dealership" in the filings, and those statements are somewhat inconsistent with his allegations about CPD's independent awareness of the vehicle's location.

vehicle's location due to reports and the GPS tracking system," (Compl. ¶ 53), Earley does not specify exactly how or when CPD began monitoring and tracking the vehicle's location with the GPS system.

In any event, on May 6, 2022, around 2:00 a.m., CPD dispatchers notified patrol officers that the stolen BMW vehicle was located near Northerly Island according to the GPS system. Officers Doe 1 and 2 "initially approached the vehicle, but then let it go." (Compl. ¶ 29g). Over the police radio, one of the officers stated, "We're not following. We're not chasing. Show us heading into [the station] to do an eluding report." (*Id.* (quoting unknown source)). According to Earley, the officers made this decision "despite being [in] possession of facts regarding [Brownlee] and his crew's extremely violent behavior and his direct whereabouts." (Compl. ¶ 45). Approximately one hour later, the vehicle appeared at the intersection of Webster and Wayne in Lincoln Park. Brownlee got out of the vehicle, ambushed, robbed, and shot Earley. He then returned to the vehicle and fled the scene.

Approximately two years earlier, on August 15, 2020, CPD instituted General Order G03-03-01, entitled "Emergency Vehicle Operations - Eluding and Pursuing". (Defs.' Mot. at Ex. 1). Essentially, the policy allows officers to engage in a motor vehicle pursuit only if "[t]he necessity to immediately apprehend the fleeing suspect outweighs the level of inherent danger created by a motor vehicle pursuit." (Gen. Order G03-03-01 § 4A). Based on this policy, CPD justified the officers' decision not to pursue Brownlee in the stolen vehicle on May 6, 2022. According to Earley, the officers "follow[ed] the . . . policy, by misjudging the application of the balancing test . . . , but engag[ed] in a course of action showing . . . disregard for the safety of others, including . . . Earley." (Compl. ¶ 35).

Earley alleges that Lightfoot and Brown both knew there was a high probability that the policy would chill and hamper officers from engaging in pursuits to stop criminals and that the policy has had that effect in practice. Earley further asserts that the "policy has specifically caused a widespread chilling of police activity by officers for fear of civil and criminal liability among officers for engaging in pursuit activities." (Compl. ¶ 42). As a result, Earley maintains that there is an increased danger to victims of violent crimes like himself, and but for the policy, he would not have been victimized and suffered injuries.

Earley filed this section 1983 action for deprivation of his due process rights under the 14th Amendment. Count I asserts a *Monell* claim against the City, Lightfoot, and Brown based on the enactment and maintenance of the policy. Count II asserts a state-created danger against Brown and the officers. Count III seeks indemnification by the City to the extent the individual defendants are found liable under Counts I and II. Defendants have moved to dismiss Earley's complaint for a plethora of reasons, the primary being that the complaint fails to state an underlying constitutional violation. The motion is fully briefed.

## **LEGAL STANDARD**

Rule 12(b)(6) permits a party to move for dismissal based on the opposing party's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In determining whether a complaint states a claim, courts must accept all non-conclusory factual allegations as true. *Ashcroft*, 556 U.S. at 678. In addition, the Court must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 626 (7th Cir. 2022). Applying these principals, a complaint will survive a motion to dismiss if it "states a plausible claim for relief." *Ashcroft*, 556 U.S. at 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To state a plausible claim

for relief, a complaint must "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679. The movant has the ultimate burden to show entitlement to dismissal. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

## DISCUSSION

The Due Process Clause of the 14th Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. For those whose 14th Amendment due process rights are violated, section 1983 creates a remedy. In pertinent part, the statute provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

### I. *Monell* Policy-Based Claim

To state a section 1983 claim against a municipality, the plaintiff must be able to satisfy three "requirements—policy or custom, municipal fault, and 'moving force' causation—[which] must be scrupulously applied in every case alleging municipal liability." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Regarding the first requirement, the constitutional violation must have been caused by a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). The Seventh Circuit has interpreted *Monell* "to include three types of actions that can support municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a

custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *First Midwest*, 988 F.3d at 986 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). For a *Monell* claim based on an express policy, one constitutional violation resulting from application of the policy is sufficient. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985)). However, if the claim is based on a widespread practice or a policy omission, there must have been more than a single incident to establish liability. *Calhoun*, 408 F.3d at 380 (citing *Tuttle*, 471 U.S. at 822-23).

Earley's complaint does not identify any explicit language from CPD's eluding and pursuing policy as the basis for his *Monell* claim. At most, the only specific allegation is that police officers "acted in willful and wanton fashion by following the . . . policy, by misjudging the application of the balancing test . . . ." (Compl. ¶ 35). Pointing to this passing reference to the balancing test provision, Defendants contend that the *Monell* claim here must be based on a policy omission instead of an express provision and thus seek dismissal of Count I because only a single incident has been alleged. Earley attempts to rectify this in his response brief by noting that several members of the public called his attorneys to report similar incidents and arguing the issue should be sorted out in discovery. He also clarified that that the policy itself has not caused a constitutional deprivation; rather, it has resulted in a chilling and hampering effect on police activity that constitutes an unconstitutional widespread custom and practice.

Earley's theory of municipal liability under *Monell* is muddled, to say the least. However, the Court need not attempt to decipher whether he alleges a constitutional violation caused by an omission from the policy or a widespread custom and practice. Either way, the complaint fails to state a claim because only one incident is alleged. Accordingly, Count I of the complaint is

dismissed without prejudice. Any amended *Monell* claim must allege more than a single incident and as discussed *infra,* satisfy the narrow criteria required to maintain a claim under the state-created danger exception.

## II. State-Created Danger

Turning to Earley's state-created danger due process claim, the first step is to determine whether there has been an underlying constitutional violation. *First Midwest*, 988 F.3d at 987. As a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). That is because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 196. Instead, the Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* Based on this interpretation of the Due Process Clause, the Supreme Court has stated that its purpose is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.*

That said, there are certain limited circumstances under which the State may be held liable for failure to protect and individuals against private violence.[4] *First Midwest*, 988 F.3d at 988. Under the "state-created danger" exception, liability for a 14th Amendment Due Process Clause violation may exist "where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993), *cert. denied*, 510

---

[4] Under the "special relationship" exception, "the state has an affirmative duty to provide for the safety of a person it has taken into its custody involuntarily." *First Midwest*, 988 F.3d at 988 (citing *DeShaney.* 489 U.S. at 199-200; *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). Neither side argues that it applies to this case.

7

U.S. 947 (1993). The Seventh Circuit has recently described the state-created danger exception as well-established[5] and articulated a three-part test for such claims:

> First, the state, by its affirmative acts, must create or increase a danger faced by an individual. Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual. Third, the state's failure to protect the individual must shock the conscience.

*Johnson v. Rimmer*, 936 F.3d 695, 708 (7th Cir. 2019) (citations and punctuation omitted) (quoting *King ex. rel King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817-18 (7th Cir. 2007)); *see also First Midwest*, 988 F.3d at 988-89; *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019); *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015). Because the third prong of the analysis is dispositive, the Court will begin its analysis there.

### A. <u>Conduct that Shocks the Conscience</u>

The inquiry into whether the State's conduct shocks the conscience is stringent, necessarily fact-bound, and satisfied by "only the most egregious official conduct[.]" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *First Midwest*, 988 F.3d at 989; *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011); *King*, 496 F.3d at 818. Indeed, "[m]aking a bad decision, or even acting negligently, does not suffice to establish the type of conscience shocking behavior that results in a constitutional violation." *Jackson*, 653 F.3d at 654-55. Because the standard lacks precise measurement, courts evaluate whether conduct is conscience shocking on a spectrum. *King*, 496 F.3d at 818-19. "[W]hen the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, [a court] shall find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual."

---

[5] Although the Seventh Circuit has also recently expressed doubt as to whether the state-created danger exception is well-founded, *Weiland v. Loomis*, 938 F.3d 917, 921 (7th Cir. 2019), the Court need not engage in that analysis because the issue is not outcome determinative here.

8

*Id.* at 819 (citing *Lewis*, 523 U.S. at 851; *Armstrong v. Squadrito,* 152 F.3d 564, 576-77 (7th Cir. 1998)). However, "where circumstances call for hurried judgments in order to protect the public safety or maintain the public order, and thereby render reasoned deliberation impractical, conduct must reach a higher standard of culpability approaching malicious or intentional infliction of injury before we shall deem official conduct conscience shocking." *King*, 496 F.3d at 819.

In *Lewis*, the Supreme Court considered which level of culpability would make conduct conscience shocking in the context of high-speed police chases. 523 U.S. at 836. There, police decided to chase a motorcycle being operated at high speeds. *Id.* at 837. During the chase, the motorcycle tipped over while taking a sharp turn, causing both the driver and the passenger to fall off. *Id.* One of the police cars was unable to stop in time and struck and killed the passenger. *Id.* Based on those facts, the Court observed that "[a] police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders." *Id.* at 853. When making such a decision there is rarely an opportunity to engage in reasoned deliberation and therefore deliberate indifference is not enough to impose liability, there must be some intent to cause harm. *Id.* at 854. Accordingly, *Lewis* held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983." *Id.*

In another tragic case involving a high-speed police chase, *Bublitz v. Cottey*, the Seventh Circuit applied the holding of *Lewis* to conclude that the plaintiff could not prevail on a 14th Amendment Due Process claim absent intent or purpose to cause harm. 327 F.3d 485, 491-92 (7th Cir. 2003). In *Bublitz,* police deployed a spike strip to stop a vehicle fleeing at high speeds. *Id.*

9

at 487. The vehicle ran over the spikes, lost control, and struck the plaintiff's vehicle, killing the plaintiff's wife and child. *Id.* Even though the plaintiff argued that the officers had adequate time (at least three to five minutes) to deliberate whether to deploy the spike strip, the Seventh Circuit held that the plaintiff could not "show that what the officers did deprived him or his family of their Fourteenth Amendment rights[,]" because he did not "seek to prove any intention or purpose on the part of the defendants to cause harm to [his] family during the course of the high-speed chase." *Id.* at 491-92.

Intent or purpose to harm or injure has also been required to satisfy the shocks-the-conscience requirement in cases involving situations analogous to a high-speed chase. *Schaefer v. Goch*, 153 F.3d 793, 798 (7th Cir. 1998). In *Schaefer*, police officers unintentionally shot and killed a woman during a standoff with her husband. *Id.* at 794. Because the situation was dangerous and fluid, officers "were forced to make decisions 'in haste, under pressure, and . . . without the luxury of a second chance.'" *Id.* at 798 (quoting *Lewis*, 523 U.S. at 852 (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). Summarizing the rule in such circumstances, the Seventh Circuit stated that "[w]hen government officers face the sort of unforeseen and rapidly changing circumstances that demand unreflective decisions with potentially grave consequences on every side, 'even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates [the concerns of substantive due process].'" *Id.* (quoting *Whitley*, 475 U.S. at 320). Thus, *Schaefer* held that the officer's "decision to fire, while certainly regrettable in hindsight, did not evince the purpose to harm that the Supreme Court has said is necessary for liability." *Id.* at 799.

While there are factual and procedural differences between those cases and the instant one, none of those distinctions materially affect the analysis here. For example, the person who suffered

the injury varies from case to case. But, as illustrated by *Bublitz*, the standards discussed apply equally in situations like this case where the victim is an innocent bystander. In addition, although all three cases discussed above were on appeal from summary judgment decisions with more developed factual records, a plaintiff must still at least allege facts plausible to satisfy the shocks-the-conscience requirement at the pleading stage to survive dismissal. Finally, it is irrelevant that the cases discussed above did not involve the state-created danger exception, because the shocks-the-conscience requirement is rooted in the Due Process Clause itself. *See King*, 496 F.3d at 818 ("because the right to protection against state-created dangers is derived from the substantive component of the Due Process Clause, the state's failure to protect the individual must shock the conscience.") (citing *Lewis*, 523 U.S. at 847). Thus, the rule articulated in *Lewis* remains equally applicable here. When a police officer faces a decision without an opportunity to engage in reasoned deliberation, the officer's conduct cannot be said to shock the conscience and therefore result in a constitutional deprivation under the 14th Amendment Due Process Clause unless the decision was made with the intent or purpose to harm or injure.

With respect to the officers' conduct in this case, Earley alleges that it shocks the conscience because they decided not to pursue Brownlee "despite being the [sic] possession of facts regarding his and his crew's extremely violent behavior and his direct whereabouts." (Compl. ¶ 45). He further alleges that "Defendants' actions shock the conscience in that the application of the [eluding and pursuing] policy in this instance directly caused Earley's injuries from Brownlee in that, but for the policy, the police would have stopped and apprehended Brownlee at numerous points in his rampage." (*Id.* ¶ 68). Finally, Earley alleges and argues that the enactment and maintenance of the policy itself shocks the conscience, but such policy based *Monell* claims fail for the reasons already discussed.

As a threshold matter, the Court must determine whether deliberate indifference is sufficient to show that the officers' conduct shocks the conscience, or if it is necessary that the officers intended to cause harm. Because this case involves police officers' decision whether to pursue a fleeing vehicle on a potentially high-speed chase, the Court concludes that the higher level of culpability applies. Even if the officers knew every fact Earley alleges about the stolen vehicle, Brownlee, and the crime spree, the decision whether to pursue was the exact type described in *Lewis*, *Bublitz,* and *Schaefer* that is typical of high-speed chases and analogous scenarios. In such situations, police officers often encounter those rapidly changing circumstances that require them to make hasty decisions under pressure. *See, e.g., Schaefer*, 153 F.3d at 798. Even viewing the allegations of the complaint in the light most favorable to Earley and drawing reasonable inferences in his favor, this appears to be the situation the officers faced here in applying the policy. As such, in order to satisfy the shocks-the-conscience prong of the analysis, deliberate indifference is not enough—Earley's complaint must plausibly allege that the officers made the decision not to pursue Brownlee's vehicle with intent or purpose to harm or injure.

This is where Earley's claim falls short. The complaint does not contain any factual allegations to suggest that the officers' non-pursuit involved any intent to cause injury. In fact, the complaint alleges the opposite—that the officers may have declined to pursue because of the purported chilling and hampering effects of the policy—which involves no purpose to cause harm whatsoever. Accordingly, Earley has not plausibly alleged that the officers' decision not to pursue Brownlee shocks the conscience. Count II therefore fails to state a 14th Amendment Due Process Clause claim under the state-created danger exception.

Based on Earley's theory of the case, it is not clear if he will be able to cure this defect in an amended complaint. Nevertheless, the Court grants leave to attempt to replead if he can do so

in good faith, consistent with this ruling, and his Rule 11 obligations. Because the complaint, as alleged, also struggles to satisfy the other two prongs of the state-created danger analysis, the Court will briefly discuss those defects as well.

### B. Affirmative Act that Creates or Increases Danger

The issue of whether the officers acted affirmatively to create or increase a danger to Earley depends largely on the officers' knowledge when they decided not to pursue, in particular, details about them approaching the vehicle and deciding to let it go. (Compl. ¶ 29g). The police officers' knowledge of the potential risk is critical to determining whether there is liability under section 1983. *See Reed*, 986 F.2d at 1125 ("It was the police action in removing [the sober driver], *combined with their knowledge of [the passenger's] intoxication*, which creates their liability for the subsequent accident.") (emphasis added). The allegation that the officers were in "possession of facts regarding [Brownlee] and his crew's extremely violent behavior and his direct whereabouts" is likely sufficient to satisfy this requirement at the pleading stage. (Compl. ¶ 45). But regardless of the officers' knowledge, the allegation that "police initially approached the vehicle, but then let it go" is so vague that it is unclear what actually happened.

On one hand, it could mean that the officers merely drove towards and near the vehicle but then decided not to pursue. "Initially approached" could also mean that officers drove towards and near the vehicle, turned on their sirens and emergency lights, instructed the driver of the vehicle to pull over on the loudspeaker, and, if the driver complied, even approached the vehicle on foot and spoke with the occupants before deciding to "let it go." If the police officers knew all of the facts alleged about the vehicle, Brownlee, and the crime spree, and "initially approached" means that they turned on their sirens and lights, ordered the vehicle to pull over, pulled it over, spoke with the occupants, "but then let it go[,]" then this case is much more analogous to a case like *Reed v. Garner* than it would be if the officers were merely provided with basic information about the

13

vehicle and then drove near it but never attempted to pull it over. To reach that conclusion, however, the Court would need to draw inferences that are not necessarily reasonable in light of other allegations in the complaint. If Earley chooses to amend the complaint, this and other key facts regarding what police knew and did require clarification.

### C. Causation

The allegations supporting causation are less troublesome but still in need of development. To state a claim under the state-created danger exception, "the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual." *Johnson*, 936 F.3d at 708. Proximate cause is generally understood to mean that there must be a direct relationship between the alleged wrongful conduct and injury. *Paroline v. United States*, 572 U.S. 434, 444 (2014). To satisfy the proximate cause requirement here, "the danger created or increased by the State must be a foreseeable type of risk to a foreseeable class of persons[.]" *First Midwest*, 988 F.3d at 988-89. "A generalized risk of indefinite duration and degree is insufficient." *Id.* In addition, as with other constitutional torts, causation in fact must be sufficiently alleged. *Flint*, 791 F.3d at 770.

Proximate cause is sufficiently alleged because Earley fell within the class of foreseeable victims. Earley was attacked in the same manner as prior victims, in the same general location, and within an hour of the officers' decision not to pursue. Causation in fact is more tenuous, however, because the complaint does not allege facts to support the conclusion that Brownlee's attack on Earley would not have happened absent the officers' decision not to pursue. While Earley's response brief speculates as to how the decision not to pursue may have affected Brownlee (e.g., by emboldening him), the complaint does not contain any allegations to support such speculation.

14

### III. Indemnification

Because the indemnification claim in Count III rises and falls with Counts I and II, Count III is also dismissed.

### IV. Other Matters

In the interest of judicial economy, the Court will briefly address other matters raised by the parties in their briefs so that they do not need to be relitigated if Earley decides to amend the complaint.

#### A. Official Capacity Claims Against Lightfoot and Brown

The official-capacity claims against Lightfoot and Brown are duplicative of the claims against the City of Chicago. *See Wilhelm v. City of Calumet City, Ill.*, 409 F. Supp. 2d 991, 994 n. 1 (N.D. Ill. 2006) (dismissing official-capacity claims as redundant of claims against municipality) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Thus, Earley cannot maintain *Monell* and state-created danger claims against the City and Lightfoot and Brown in their official capacities at the same time.

#### B. Personal Capacity Claim Against Brown

Because there are no allegations of any personal involvement by Brown in the decision not to pursue Brownlee, the personal-capacity claim against Brown on Count II is viable only to the extent that Earley is able to allege facts consistent with supervisor liability. "[F]or a supervisor to be liable for the allegedly wrongful conduct of others, he must both (1) 'know about the conduct' and (2) facilitate, approve, condone, or turn a blind eye toward it*.*" *Gonzalez v. McHenry Cnty., Ill.*, 40 F.4th 824, 828 (7th Cir. 2022) (quoting *Kemp v. Fulton Cnty.*, 27 F.4th 491, 498 (7th Cir. 2022)). "Under the second prong, a supervisor is liable if he acted purposefully, knowingly, or recklessly, but *not* negligently." *Id.* (emphasis in original). As alleged, the complaint lacks factual

15

allegations about any involvement by Brown in the decision not to pursue Brownlee that would support a personal capacity claim.

### C. Injunctive Relief

To the extent that the parties agree that Earley's request for injunctive relief is improper, it should be omitted from any amended complaint. If Earley later discovers information that he believes would support standing for such relief, he may request leave to amend.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted, and Plaintiff's complaint is dismissed without prejudice. Plaintiff is granted leave to file an amended complaint consistent with this ruling by March 25, 2024. If no amended complaint is filed by that date, the case will be deemed dismissed with prejudice and closed without further notice.

**DATED**: February 26, 2024  **ENTERED**:

_LaShonda A. Hunt_
LaShonda A. Hunt
United States District Judge