**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DAKOTAH EARLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cv-0801 |
| v. | ) | |
| | ) | The Honorable Judge LaShonda Hunt |
| CITY OF CHICAGO, ILLINOIS, *et al.*, | ) | |
| | ) | Magistrate Judge M. David Weisman |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION (DKT. 63) TO DISMISS FIRST AMENDED COMPLAINT (FAC)

Dakotah Earley (Earley or Plaintiff), by and through his undersigned counsel, Cass T. Casper, DISPARTI LAW GROUP, P.A., responds as follows to Defendants' Motion to Dismiss the FAC (Motion) (Dkt. 63). For the following reasons, the Motion should be denied.

## STATEMENT OF FACTS

On May 6, 2022, Earley was walking near his home in the Lincoln Park neighborhood when he was robbed and shot by Tyshon Brownlee (Brownlee). Dkt. 47 at ¶¶14, 18. At the time of the shooting, Brownlee had been involved in a spree of robberies and violent acts on Chicago's north side. Dkt. 47 at ¶19. Prior to this shooting, at around 12:51 a.m. on May 6, 2022, Chicago police dispatchers notified at least Defendants police officers Eduardo Camilo, Jr. (Camilo) and Gustavo Marchon (Marchon) that a GPS tracker had located a stolen BMW in the vicinity of Northerly Island, east of Soldier Field. Such stolen vehicle had been taken from an armed robbery victim in Lakeview on or around May 4, 2022, and Chicago's dispatch center had been radioing about further criminal activity it was involved in after that, including around 11:42 p.m. on May 5, 2022, just a couple hours prior to the shooting. Dkt. 47 at ¶¶21, 43. Despite that dispatch had been radioing about the dangerous criminal activity of those in that BMW, Officers Camilo and Marchon declined to pursue Brownlee. Had they done so it would have prevented Brownlee from

encountering Earley about an hour later and shooting him, leading to Earley's catastrophic injuries. Dkt. 47 at ¶¶15, 22. Plaintiff brings the instant three-count lawsuit against Defendants Camilo and Marchon alleging that their actions caused Plaintiff's injuries. He also avers that the City's passage of its non-pursuit policy created an environment where officers are chilled in their willingness to respond to criminal activity, thus causing Plaintiff's injuries here.

<u>ARGUMENT AND ANALYSIS</u>

I.      **Plaintiff Suffered A Constitutional Deprivation.**

Contrary to Defendants' arguments as to Counts I and II, Plaintiff has adequately plead affirmative acts creating and increasing the danger of injury, adequately plead that Defendants' conduct was conscience-shocking, and adequately plead causation.

a. *Defendants Took Affirmative Acts That Created And/Or Increased Danger To Plaintiff.*

Defendants argue Plaintiff does not plead an affirmative act placed him in danger, and cites to this Court's ruling on the first motion to dismiss as requiring more detail about what the individual officers knew. Dkt. 63 at 5. They claim that Plaintiff's pleading regarding the Eluding Report and Office of Emergency Management and Communication dispatch printout do not support the notion that the officers knew more. Dkt. 63 at 5. They argue that the report only shows that the officers knew it was a stolen vehicle and was fleeing, and does not mention other crimes, and that the dispatch report refers to other officers, not the individual Defendants. Dkt. 63 at 6.

As a preliminary matter, Defendants make an argument that is improper for the pleadings stage when they include footnote 1 interpreting the numbers on the dispatch report. Dkt. 63 at 6. The meaning of those numbers is a discovery issue, Plaintiff does not agree with Defendants' interpretation, and it is the FAC that is being assessed here, not discovery matters.

Substantively, first, the FAC adequately pleads affirmative acts by Defendant officers that increased the danger to Plaintiff. He pleads that he was walking near home when he was robbed and

2

shot by a pair of thieves. Dkt. 47 at ¶14. Brownlee was the shooter, acting as part of a crew from a stolen BMW. Dkt. 47 at ¶18. At 12:51 a.m. on that date, prior to the shooting, police dispatch notified Defendants Camilo and Marchon that a stolen BMW was located in their vicinity. Dkt. 47 at ¶20. The vehicle was taken from an armed robbery victim. Dkt. 47 at ¶21. Despite this, Defendants declined to follow the vehicle and wrote an Eluding Report. Dkt. 47 at ¶22. The Eluding Report cites that the BMW was involved in a "felony," and that it was "speeding," "weaving," and was driving on a "One Way." Dkt. 47 at ¶22. It notes that the BMW "evaded," and that "R/O's activated their emergency equipment lights and attempted to conduct a traffic stop, at [which] time above vehicle fled from traffic going at a high rate of speed." Dkt. 47 at ¶22. Contrary to what Defendants' argue about this Court's first ruling, Plaintiff has plead in spades additional knowledge of the individual officer Defendants. Their own Eluding Report shows that they knew the BMW was involved in a "felony," that it was "stolen," and that it was "weaving" and "speeding." It also shows that Marchon and Camilo activated their lights and attempted to conduct a traffic stop. This set of actions increased the danger to Plaintiff, and it is easy to see why: had Marchon and Camilo just (i) pursued, or (ii) stopped Brownlee, Brownlee never would have encountered Earley and shot him. This is because the additional delay from either action would have put Earley elsewhere at the time Brownlee otherwise shot him. Think of it this way: perfect timing placed Brownlee and Earley at the same location on May 6, 2022. Disturb that timing, either through a traffic stop, an arrest, or a pursuit, and Earley and Brownlee never meet. In other words, *but for* Brownlee's eluding Marchon and Camilo, Earley is never shot. Within this chain-of-events, Plaintiff pleads at least four affirmative acts that created or increased the danger to Plaintiff. *See* Dkt. 47 at 8-9, ¶35. Thus, Plaintiff has adequately plead affirmative acts and then some.

Second, Plaintiff pleads an entirely different affirmative act by Defendant City that created and increased the danger, which is the passage of the non-pursuit policy. *See* Dkt. 47 at ¶¶36, 51, 53-

54. Accordingly, Defendants' argument that Plaintiff does not plead affirmative acts that create or increased the danger is just wrong, he pleads (1) officers' actions so constituting, and (2) the passage of the policy so constituting. The Motion should be denied on this basis.

Turning to this Court's decision on the first motion, it dismissed the prior complaint as to the state-created danger claims by finding that the instant case is akin to cases involving officers deciding to engage in high-speed chases. Dkt. 40 at 12. This Court concluded that the individual officers must have had intent or purpose to harm in order for Plaintiff to state a state-created danger-based claim. Dkt. 40 at 12. The Court then stated that the Complaint contained no facts suggesting that the officers' non-pursuit involved any intent to cause injury. Dkt. 40 at 12. The foregoing additional facts from the FAC could reasonably be interpreted as showing intent to harm or injure. For example, it is conceivable that disgruntled CPD officers were quietly hoping for citizen injuries as part of an overall dissatisfaction with the CPD's non-pursuit policy that was in effect at the time of this case. Perhaps Marchon and Camilo, sitting in their squad, say to one another, "well, there goes another one. This Department isn't what it used to be and we have to stand down because that's what the Brass want. I hope no one gets hurt." Or maybe it was more cynical: "I hope someone gets hurt to teach the Brass a lesson."[1] We do not know at this date what Marchon and Camilo said or thought because this case is at the pleadings stage. But it is conceivable that officers facing this situation might have been thinking or talking along those lines. And take the facts as plead: (i) they knew the BMW was involved in a felony (Dkt. 47 at ¶22); (ii) they knew it was speeding and weaving (Dkt. 47 at ¶22); and, (iii) they knew it was a stolen vehicle (Dkt. 47 at ¶22). The other facts noted in the Eluding Report come into

---

[1] For example, recall that during the Van Dyke trial it was revealed that on the way to the McDonald scene, Van Dyke stated "Oh my God, we're going to have to shoot the guy." *See* Van Dyke suggested shooting McDonald before arriving on scene - Medill Reports Chicago (northwestern.edu). The purpose of this reminder is to show that it is not outlandish to suggest that Officers Marchon and Camilo might have had some "disgruntled told-you-so" mindset when this played out. And one only needs to follow news about the police Union's President to understand that our force is mightily disgruntled in these times.

play next: (i) there was no traffic (Dkt. 47 at ¶22); (ii) there was dark lighting, meaning there was lighting (Dkt. 47 at ¶22); (iii) there was no pedestrian traffic (Dkt. 47 at ¶22); and, (iv) this whole encounter was in a private-ish area on Solidarity Drive (Dkt. 47 at ¶22). In other words, why didn't they stop this vehicle or at least pursue it? The conditions as noted in the Eluding Report were apparently okay. So what was the issue? A reasonable person looking at those facts would have questions, such as: (1) were they being lazy? (2) were they concerned for safety? or, (3) were they deliberately standing down in the face of chaos so "we can show the Brass"? As to (2), a "safety" concern rings hollow given the weather and traffic facts on the Eluding Report. So why not pursue Brownlee? Or was it that, officers disgruntled and unhappy with a City, Mayor, and Superintendent on the attack against them, chose to stand down, hoping the worst would happen so that the City could see how ridiculous Mayor Lightfoot's and Superintendent Brown's non-pursuit policy was, and why the public has it wrong to trash cops when they are here to protect and serve? "Let's remind them why we're here," so this theory of the case goes. And that is this case: Earley's injuries were the result of a demoralized force filled with officers not only afraid to police, but disinclined to. The bottom line here is that Plaintiff submits he has plead enough facts about affirmative actions creating and increasing the danger to Plaintiff for this case to go into discovery. Defendants' arguments may win at summary judgment, but his case is over-the-line at the pleadings stage.

      b. *Defendants' Conduct Is Conscience-Shocking.*

      Defendants next argue that Plaintiff has not plead "conscience-shocking" facts, which are assessed on a spectrum and, as this Court held in its first motion ruling, turn on whether there is time for reasoned deliberation or not. Dkt. 63 at 6. Defendants note that this Court ruled that the facts in this case align with the cases holding that if there is no time for reasoned deliberation, then the appropriate legal standard is whether or not the officers acted with intent to injure. Dkt. 63 at 6. They state that the Eluding Report shows that there was no time for reasoned deliberation because it

shows the vehicle drove away immediately. Dkt. 63 at 7. These arguments lack merit, as Plaintiff has plead facts to meet both the deliberate indifference standard as well as the intent to harm standard.

The Eluding Report itself contains officer admissions that they had time to engage in reasoned deliberation. It admits that they saw the BMW parked and facing westbound on Solidarity Drive. Dkt. 47 at ¶22. It admits that they had time to run it in LEADS. Dkt. 47 at ¶22. That is a key fact because the officers now have time in between the LEADS search and when they activate their lights and sirens to engage in reasoned deliberation. That might be many minutes. It might be an hour. We do not know at the pleadings stage, but it is certainly reasonable to infer that the officers had ample time to engage in reasoned deliberation. By the way, isn't this really a question for discovery, anyway, how much time they had to engage in deliberation and how this scene unfolded? Plaintiff has certainly posited facts that, with the favorable inference he is entitled to at this stage, the officers had time to engage in reasoned deliberation. That means the appropriate legal standard, then, is "deliberate indifference" per this Court's February 26, 2024 ruling. *See* Dkt. 40 at 11-12. But even if it is the heightened standard of "intent to injure," Plaintiff in the previous section laid out a scenario where the individual officers really did have "intent to injure," that is, the one where disgruntled officers want to "give the City a spoonful of its own medicine so let's let this dangerous offender wreak havoc." So, under either legal standard, Plaintiff has plead sufficient facts to meet the "conscience shocking" standard.

At the end of the day, Plaintiff respectfully urges this Court to allow this case to go into discovery. Even writing this Response, there are so many questions that arise about the events of May 6 just from the Eluding Report, some of which are set forth above. It is one of those cases, too, where the applicable legal standard could change based on the discovery: is it deliberate indifference or is it intent to harm? We cannot really say at this point in the case. This Court, admittedly, saw the facts as "intent to harm," but that was a conclusion it reached under the prior Complaint without

the benefit of the Eluding Report and the OEMC Report that are included in this FAC. *See* Dkt. 63 at ¶¶22, 43. For the foregoing reasons, Plaintiff would ask that this Court deny the Motion.

      c. *Plaintiff Has Adequately Alleged Cause In Fact.*

      The causation-in-fact could not be clearer in this case: if Marchon and Camilo had stopped Brownlee, Brownlee would never have been at the place where he shot Plaintiff. The timing facts alleged in the FAC support this. Plaintiff pleads that "radio dispatch logs from after 11:00 p.m. on May 5, 2022 showed that dispatchers were reporting that Brownlee's vehicle had just committed an armed robbery. . ." Dkt. 47 at ¶43. Then Plaintiff pleads that around "12:51 a.m. on May 6, Chicago Police Dispatchers notified patrol officers that the GPS tracker had located the stolen BMW in the Northerly Island area; the police initially approached the vehicle, but then let it go. Police stated over the radio "[w]e're not following. We're not chasing. Show us heading into [the station] to do an eluding report." Just about an hour later, Earley was shot by the occupants of the vehicle." Dkt. 47 at ¶33(g). With these facts, we have Earley being shot by Brownlee within the one-hour period following 12:51 a.m., within which time Marchon and Camilo locate the BWM, activate their lights, attempt a stop, and do not pursue. The time period between 12:51 a.m. and Earley's shooting may shrink in discovery, meaning that the timing gets closer, and the "causation" argument stronger and stronger. But "timing" is not all of "cause," and beyond the close proximity between Marchon and Camilo's decision is the commonsense of it: if they had stopped Brownlee for even one minute in a traffic stop, Earley would have walked one-minute's worth of City blocks, and never encountered Brownlee. Cause-in-fact is plead.

**II.**    **Count II Stands Because Plaintiff Has Adequately Alleged Widespread Practice, Deliberate Indifference, And Moving Force.**

      Defendants next argue that Plaintiff has not adequately stated the elements of a *Monell* claim. Dkt. 63 at 9. Defendants first argue they cannot tell whether Plaintiff is pleading a "policy" or

"practice" *Monell* claim, and Plaintiff clarifies here that it is a "practice" claim.[2] Defendants fault Plaintiff for relying mostly "on his experience" in the FAC. Dkt. 63 at 11. They cite to Judge Kendall's ruling in *Alcorn v. City of Chicago*, 2018 WL 3614010 (N.D. Ill. July 27, 2018), emphasizing that a plaintiff must allege more than one incident for a "practice" claim to survive. Dkt. 63 at 11. They criticize Plaintiff's comparators as belated, as only two, and not specific enough, in particular because they are "after the fact" of Plaintiff's. Dkt. 63 at 11.

First, Plaintiff has pleaded three additional incidents. At Paragraph 63, Plaintiff pleads:

- Robert E. Barnes was killed on Father's Day in June 2023 around 99th and Princeton by an offender who shot him in the head and chest after police called off a chase of a Honda that had been involved in multiple felonies.

- On or about August 16, 2023, there was an armed robbery spree that began around 2400 North Ashland where multiple Chicago police officers observed armed men robbing victims, but their supervisor ordered them not to engage in a pursuit, resulting in further crimes being committed by the offenders. Police surveillance tracked the vehicle from there to around 5200 North Damen, and then to 6500 North Western, where the passengers committed another robbery. A squad car appeared on scene, but a supervisor ordered officers not to pursue. *See* Video shows Chicago police arriving at a robbery in progress, but the cops were ordered to stop chasing the offenders - CWB Chicago.

*See* Dkt. 47 at ¶63. We have an instance here of a man, Robert Barnes, being shot and killed after police called off a chase, with dates, locations, and a Honda driven by a repeat offender. This is specific enough for the pleadings stage. The August 16, 2023 incident also involves dates, locations, that robberies were involved, and that a supervisor called off pursuit. Next, we have the following pleading:

- Indeed, the problem has gotten so bad that an "Unknown Driver" has started a social media exercise of daring police to engage him in pursuit, and records when they do not. *See* On Instagram, the 'Unknown Driver' dares cops to pull him over and speeds away when they try - CWB Chicago.

*See* Dkt. 47 at ¶63. The City bemoans that as Instagram, but let's think about what it says: we have a driver who has recognized the problem of police non-pursuit as being so bad in Chicago that he has started a hobby of taunting police to chase him and recording him when they don't. The

---

[2] This confusion was also present in the first-round motion to dismiss, and Plaintiff clarified then that it was intended to be a "practice" claim. *See* Dkt. 19 at 12 (stating that this case presents a practice claim).

above CWB article states this about it: <u>"Whoever he is, the Unknown Driver seems acutely aware that he can do just about anything behind the wheel, and Chicago cops won't pursue him."</u> The fact that Chicago has such a renegade speaks volumes to how bad the problem has gotten. Dominant and widespread enough? Well, Earley was shot, Robert Barnes was killed, and August 16, 2023 incident involved armed men robbing victims and police not chasing. How much more do we need to bring this claim into discovery? 1 more? 10 more? 50? *Alcorn* failed "to identify a single other instance" of arrests lacking probably cause; hence, it was a "one time" case, and that is not enough to state a practice claim. But cases have been allowed through the pleadings stage with a small number of separate instances or with generalized pleadings without specific instances. *See Peterson v. City of Chicago*, 14-cv-9881, 2015 WL 13882814, at *4-5 (N.D. Ill. June 23, 2015) (J.Dow) ("these three allegations state a claim for a widespread practice"); *Sledd v. Lindsay*, 102 F.3d 282, 288-89 (7th Cir. 1996) (allowing a *Monell* claim where plaintiff pleaded that "the City and the CPD maintained a code of silence; that disciplinary complaints almost never resulted in official censure; and that this practice hurt him in particular, by making the officers believe their actions would never be scrutinized."). And *White v. City of Chicago*, 829 F.3d 837, 843-44 (7th Cir. 2016), would have allowed a sparser practice claim through than Earley's here, stating as follows:

"The Supreme Court held in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), that federal courts may not apply a "'heightened pleading standard'—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure—in civil rights cases alleging municipal liability under ... 42 U.S.C. § 1983." The Court emphasized that "Rule 8(a)(2) requires that a complaint include only a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Id.* at 168, 113 S.Ct. 1160; see also *Geinosky v. City of Chicago*, 675 F.3d 743, 748, n. 3 (7th Cir. 2012). The *Leatherman* holding has survived the Court's later civil pleading decisions in *Iqbal* and *Twombly*, which require the pleader to allege a "plausible" claim. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

White alleged in his amended complaint: "In accordance with a widespread practice of the police department of the City of Chicago: O'Donnell requested the judge to issue a warrant on the basis of O'Donnell's conclusory allegation that other law enforcement officers claimed or believed plaintiff had committed an offense, and O'Donnell did not present the judge with an affidavit setting out any affirmative allegation of facts that would indicate that plaintiff had committed an offense." Together

with the individual claim against O'Donnell and the standard printed form that does not require specific factual support for an application for an arrest warrant, this allegation was enough to satisfy the "short and plain statement of the claim" requirement of Rule 8(a)(2). White was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process. See, e.g., *Jackson v. Marion County*, 66 F.3d 151, 152–53 (7th Cir. 1995)."

See *White v. City of Chicago*, 829 F.3d 837, 843–44 (7th Cir. 2016)[3]; *see also Taylor v. Norway*, 2021 WL 4133549, at *4-5 (N.D. Ill. Sept. 10, 2021) (practice claim sufficiently stated at the pleadings stage). The City's argument these Plaintiff's specific instances are "after the fact" is unsupported by any case law showing incidents must precede Plaintiff's – and why do they need to? If Plaintiff was the first injured by an unconstitutional practice or the last, what difference does it make if the practice is the moving force behind an injury? In any event, in this case, Plaintiff submits that this pleading does better than the plaintiffs did in *White*, *Peterson*, and *Sledd*, and he should be allowed to get through to discovery, especially as *White* tells us that we are not held to a heightened pleading standard with these claims.

Finally, Defendants write three short sentences that Plaintiff fails to plead a policymaker was deliberately indifferent or that the practice was the moving force behind Plaintiff's injuries. *See* Dkt. 63 at 11-12. To the contrary, Plaintiff so pleads at Paragraphs 36-39 (pleading that Defendant City's actions in passing the policy were deliberately indifferent to it chilling officer pursuits, all causing Earley's injuries). Based on the foregoing reasons, Defendants' Motion should be denied.

### III.     Defendant Officers Are Not Entitled To Qualified Immunity.

Defendants next argue that the individual Defendants are entitled to qualified immunity. Dkt. 63 at 12-13. Defendants cite only general cases for this assertion, and then attempt to distinguish Plaintiff's specific analogues. *See White v. Rochford*, 592 F.2d 381 (7th Cir. 1979); *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998); *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993).

---

[3] *White* loses for lack of a constitutional injury, but its practice reasoning wins for Earley here.

Plaintiff's cases are closely-analogous, too. In *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993), the plaintiffs suffered injuries when a drunk driver crossed the center line of a highway and struck their vehicle. The following excerpt from *Reed*'s facts are key to this case:

"Earlier that day, defendants Gardner, Davidson, and Bender had arrested the original driver of the car, leaving a drunk passenger behind. That passenger became the drunk driver who caused the head-on collision approximately two hours later."

*Reed*, p.1123. The District Court dismissed the Plaintiff's claims because, it claimed, *DeShaney* meant that the *Reed* plaintiffs could not state a constitutional deprivation, the same argument the City makes here. The Seventh Circuit then had to decide whether or not the injured *Reed* plaintiffs could state a claim under Section 1983 "when police officers arrest a sober driver and leave behind an obviously drunk passenger who takes the wheel." *Id.* at 1124. *Reed* recognized that *DeShaney* "leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger." Key here is *Reed*'s language that:

"Police officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable. Certainly the Reeds are worse off with a drunk driver heading toward them than a sober one."

The *Reed* court distinguished itself from cases "in which state actors had no hand in creating a danger. . ." What made the *Reed* plaintiffs have a valid claim was that "[i]t was the police action in removing [the drunken driver], combined with their knowledge of [the passenger's] intoxication, which creates their liability for the subsequent accident." *Id.* at 1125. So too, the *Reed* court contended with the foreseeability argument made by the City in Section II of its Motion as follows:

"The defendants' lack of direct contact with the appellants does not necessarily preclude this action against them. By removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one. The dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration. *See Nishiyama v. Dickson County,* 814 F.2d 277, 280 (6th Cir.1987) (en banc) (§ 1983 liability found where inmate uses patrol car to detain motorist whom he then murders, "identity of potential victims [not] difficult to define"). . ."

*Reed*, at 1127. Just like the dangers of a drunk driver being familiar and specific and the immediate threat of harm being of limited range and duration, Earley's FAC alleges facts that show that the threat presented by Brownlee and his crew in that stolen BMW was familiar and specific, and an immediate threat. Paragraph 33 lays this out – Brownlee and his crew had just been engaged in repeated robberies and shootings that could only be described as a complete rampage as set forth in Paragraph 33. Dkt. 47, ¶33. To let this vehicle go under the auspices of the pursuit policy and its chilling effects not only shocks the conscience and offends the principles of justice enshrined in the Due Process Clause, it was completely foreseeable that Brownlee and his crew would engage in another armed robbery and shooting to the same extent it was foreseeable that a drunken driver will hit another vehicle and cause injury. Perhaps this case would be different if Brownlee and his crew were one-time robbers and shooters and not out on an extreme criminal shooting and robbing spree, or if the police did not know which vehicle (the stolen BMW) was being used in these acts. But the shock to the conscience and offense to justice falling within the scope of the Due Process Clause in this case is that the police had a specific location of the vehicle, they approached the vehicle, and then they stood down in favor of an eluding report all because of the effects and outcomes of the non-pursuit policy. Dkt. 47 at ¶22.

As to what Camilo and Marchon knew, we have their own Eluding Report that they knew the car was involved in a "felony" and was "stolen." Dkt. 47 at ¶22. We also have the OEMC dispatch report that records that dispatch was radioing about a white vehicle with a license plate "CY46374" having just committed an armed robbery – and that is prior to the Earley shooting and prior to Marchon and Camilo's encounter with Brownlee. Dkt. 47 at ¶43. That's one digit off the license plate on the Eluding Report. *Compare* Dkt. 47 at ¶43 (listing CY46374) with Dkt. 47 at ¶22

(listing CY96374).[4] In other words, the FAC includes evidence that (1) dispatch was radioing information about Brownlee's vehicle being involved in an armed robbery around an hour before the officers encounter it, (2) the same/close license plate is in both the Eluding and OEMC Reports. The deposition would ask: did you hear those dispatches? What was on your radio? Tell me about the information you had accessible in your squad car between 23:42:14 on May 5 and 12:51 on May 6? The point is, this FAC pleads a lot of facts pointing to Marchon and Camilo knowing exactly what that BMW they encountered had been involved in.

*Reed* is not the only case supporting Plaintiff. In *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), a citizen fell into a lake, police responded, only to have another deputy order the responding authorities to stand down as follows:

"Before any rescue attempt could begin, however, Lake County Deputy Sheriff Gordon Johnson arrived in a marine patrol boat. The city of Waukegan and Lake County had previously entered into an intergovernmental agreement that required the county to provide all police services in the entities' concurrent jurisdiction on Lake Michigan. Under its authority to police the lake, the county and its sheriff had promulgated a policy that directed all members of the sheriff's department to prevent any civilian from attempting to rescue a person in danger of drowning in the lake. This policy contemplated that only divers from the city of Waukegan Fire Department could carry out such a rescue. *** With this policy in mind, Deputy Johnson ordered all of the persons then on the scene to cease their rescue efforts. When the civilian scuba divers stated that they would attempt the rescue at their own risk, Johnson responded that he would arrest them upon their entry into the water and even positioned his boat so as to prevent their dive. A Waukegan police officer agreed that Johnson had authority over the scene and advised his fellow city employees that they should heed Johnson's instructions."

*Ross*, at 1425-1426. Seventh Circuit in *Ross* held that the plaintiff stated causes of action for unconstitutional deprivations against the County and the individual deputy who ordered off the rescue. *Id.* at 1430-1433. The Section 1983 count against the County survived dismissal because, *inter alia*, "as portrayed in Plaintiff's complaint, Lake County's police not only tolerated a risk that someone might drown but actually contemplated that some persons would die for the sake of preventing harm to

---

[4] That license plate discrepancy is a discovery issue, but commonsense is someone made a typo on one or the other reports. Plaintiff should get a favorable inference about that at the pleadings stage.

private rescuers." *Id.* at 1431. The Seventh Circuit found the deputy liable because he acted under color of law and his liability tracked the reasoning of the County's liability. *Id.* at 1432. Once again, in Dakotah's case, as alleged the police officers stood down from pursuing a vehicle they knew was involved in a felony and that they knew was stolen. Dkt. 47 at ¶22.

Another case that supports Dakotah is *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). In that case, the District Court dismissed a complaint that alleged that minors were riding in a vehicle when the driver was stopped and arrested. *White*, at 382. The arresting officers refused to take the children to the police station or a phone booth, causing them to cross eight lanes of traffic to find a phone to call their mother, who also asked for police assistance and was refused. *Id.* The children suffered mental injury and one was hospitalized. *Id.* The Seventh Circuit held that such conduct "indisputably breaches the Due Process Clause." *Id.* at 383. Separate from the arguments in this section, the Court notes, which is applicable to this case, that "it can hardly be doubted that chief among [protected liberties] is the right to some degree of bodily integrity." *Id.* at 383 (citing *Ingraham v. Wright*, 430 U.S. 651, 673 (1976)). The Court noted that the Due Process Clause also restrains state activities which are "fundamentally offensive to 'a sense of justice' or which 'shock the conscience'." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)). The Court found that the *White* complaint stated a cause of action because, *inter alia*:

"It is clearly established that although officials may not be held liable for simple negligence, they may be held liable for 'gross negligence' or 'reckless disregard' for the safety of others. In the case before us the police could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic. This indifference in the face of known dangers certainly must constitute gross negligence."

*Id.* at 385 (footnotes omitted). The same reckless disregard for the known dangers presented by the Brownlee vehicle alleged in Dakotah's FAC is a focal point of this case because Plaintiff has plead that the officers could not avoid knowing that, absent their chasing and apprehending the Brownlee vehicle, the vehicle would commit further atrocities.

14

Of course, the City will likely rejoin that none of the foregoing cases are *identical* to this one, but the case law does not require *identity* of facts, but rather "[i]f no controlling precedent exists, 'we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Reed v. Palmer*, 906 F.3d 540, 547 (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)). The foregoing cases adequately outline that qualified immunity does not apply in this case.

## IV.     Plaintiff Dismisses Brown As Duplicative.

Plaintiff agrees to voluntarily dismiss Defendant Brown.

## V.     Count III Stands As Counts I And II Stand.

Because Counts I and II state claims, the indemnification count stands.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion in its entirety.

Respectfully submitted,

**DAKOTAH EARLEY**

By:     */s/ Cass T. Casper*
_____
One of Plaintiff's Attorneys

*Cass T. Casper, Esq.*
DISPARTI LAW GROUP, P.A.
121 West Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
E: cass.casper@dispartilaw.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 3, 2024 he caused to be served the foregoing

document on all counsel of record via this Court's CM/ECF filing system, and that all such counsels

are registered e-filers.

By:     */s/ Cass T. Casper*

_____